**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                     Case No.  3:13-cr-100-J-32JRK

JOHN EDWIN CORN, JR.
_____/

## REPORT AND RECOMMENDATION[1]

### I.  Status

        This cause is before the Court on Defendant's Motion In Limine to Exclude the In-Court and Out-of-Court Identification of John Edwin Corn by Kenneth Bellido (Doc. No. 40; "Motion"), filed on January 13, 2014.  The Government filed a response in opposition to the Motion on January 24, 2014.  See United States' Response in Opposition to Defendant's Motion In Limine to Exclude the In-Court and Out-of-Court Identification of John Edwin Corn by K.B. (Doc. No. 41; "Response").

        In sum, the Motion seeks to exclude two (2) identifications of Defendant by Kenneth Bellido ("Mr. Bellido"), who is an assistant manager with Publix supermarkets.  The first identification Defendant seeks to exclude is an out-of-court identification by Mr. Bellido on November 8, 2012 at the Publix supermarket located at 7640 W. Sand Lake Road in Orange County, Florida, where Mr. Bellido worked at that time.  The Indictment alleges that Defendant robbed several Publix supermarkets.  The Publix supermarket where Mr. Bellido

_____

        [1]        The parties have waived the fourteen (14) day objection period and have agreed to shorten the time for filing objections and for responding to any objection filed.  Based on the parties' agreement,  specific, written objections shall be filed no later than **February 20, 2014**; a response to any objection shall be filed no later than **February 24, 2014**.  See 28 U.S.C. § 636; Fed. R. Crim. P. 59; Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida.  Failure to file a timely objection waives a party's right to review. Fed. R. Crim. P. 59.

worked on November 8, 2012 is not one that the Indictment alleges was robbed, but the Government contends that Defendant entered this Publix on November 8, 2012 with the intention of robbing it.  The identification by Mr. Bellido was made after, according to Defendant, Mr. Bellido was shown a single photograph of Defendant by an Orange County deputy sheriff.  Defendant contends the identification procedure was unduly suggestive, and the identification was not reliable.

Defendant also seeks to exclude the in-court identification of Defendant by Mr. Bellido during the trial.  Defendant argues that any in-court identification would be tainted by the unduly suggestive identification made on November 8, 2012.

A status hearing regarding the Motion was held on February 4, 2014.  See Minute Entry (Doc. No. 47).  At the hearing, the parties indicated they believe a pre-trial ruling on the Motion is appropriate.  Consistent with the parties' position, an evidentiary hearing was held before the undersigned on February 10, 2014.  See Minute Entry (Doc. No. 51).  The matter is now ripe for consideration.

## II.  Background

Defendant is charged in a four (4)-count Indictment returned by the grand jury on May 16, 2013.[2]  Counts One (1) through Three (3) allege Defendant committed three (3) separate Hobbs Act robberies on various dates in the Middle District of Florida, in violation of 18 U.S.C. § 1951(a).  Count Four (4) charges that Defendant possessed and brandished a firearm in furtherance of the robbery charged in Count Three (3), in violation of 18 U.S.C. §

---

[2]    The Indictment originally contained five (5) counts, but Count Five (5) was dismissed on February 12, 2014 upon request of the Government.  See Doc. Nos. 49, 54.

924(c)(1)(A)(ii).[3]  Jury selection is scheduled for February 28, 2014, and the trial is set to commence on March 3, 2014.

### III.  Evidentiary Hearing

At the evidentiary hearing on February 10, 2014, the Government called two (2) witnesses: (1) Mr. Bellido; and (2) Ryan Flinn, a deputy sheriff with the Orange County, Florida Sheriff's Office ("Deputy Flinn").  The Government submitted three (3) exhibits into evidence: a full-page black and white photograph of Defendant (Gov. Ex. 1); a black and white Publix "Be on the Lookout" ("BOLO") bulletin that references an armed robbery suspect and contains surveillance photographs of the suspect (Gov. Ex.  2); and a black and white "Driver and Vehicle Information Database" ("DAVID") printout for Defendant (Gov. Ex. 3).  Defendant submitted two (2) exhibits into evidence: a "Calls-for-Service Inquiry Response" dated November 8, 2012 ("CAD Report") (Def. Ex. 2); and the same Publix BOLO as Gov. Ex. 2, but it is printed in color (Def. Ex. 3).   The testimony of each of the Government witnesses is summarized below, followed by a brief discussion of the exhibits and credibility findings.[4]

### A.  Mr. Bellido

Mr. Bellido has been employed by Publix supermarkets for twenty (20) years. He is presently an assistant store manager in Winter Park.  From 2011 to 2013, he was the

---

[3]     A scrivener's error in Count Four (4) of the Indictment was corrected by Order entered on February 12, 2014 (Doc. No. 53).  Count Four (4) originally referred to Count Two (2); it has since been corrected to refer to Count Three (3).

[4]     The February 10, 2014 hearing has not yet been transcribed by a court reporter.  The undersigned has relied on notes taken during the hearing and on the audio recording of the hearing to summarize the facts.

assistant manager at a Publix located at 7640 W. Sand Lake Road in Orange County, Florida. As an assistant manager, he manages the entire operation when the general manager of the store is not present.

According to Mr. Bellido, Publix has a loss prevention department that collects information about crimes, including robberies, at Publix stores and in areas around Publix stores. Mr. Bellido regularly receives emails from the loss prevention department containing surveillance photographs of persons suspected of criminal activity. He reviews these emails on a daily basis. He has not received any special training regarding these matters, although one of his duties is to stay aware of them.

Sometime during the week or two leading up to November 8, 2012, Mr. Bellido received via email a BOLO from the loss prevention department about a person who had attempted to rob Publix stores. The BOLO contained pictures that were in color, including surveillance pictures of the suspect. The BOLO also reflected that the individual asked to speak with the manager before attempting to carry out the robberies. Mr. Bellido reviewed the BOLO, read all of the information, and looked at the pictures. The pictures reflected a person with "funny" hair and with one shoulder down and one shoulder up. Mr. Bellido kept an eye out for this person.

Mr. Bellido did not print out the email containing the BOLO, but he did review it on more than one occasion prior to November 8, 2012. He does not recall exactly how many times he reviewed it. He also does not recall whether he kept the email or whether he eventually deleted it.

Mr. Bellido was working on the evening of November 8, 2012 at the Sand Lake Road Publix.  As he was walking away from the deli, a person approached him and asked for the manager.  The person had steak and a bag of oranges in his cart.  The moment he saw this person, Mr. Bellido recognized the person from the BOLO, and he remembered from the BOLO that the person's modus operandi was to first ask for the manager.[5]  According to Mr. Bellido, the clothes worn by the person who approached him matched the clothes worn by the person in the BOLO.  Also, the person who approached him had a "dipping" shoulder like the person in the BOLO.  By "dipping" shoulder, Mr. Bellido meant the person had one shoulder up and the other shoulder down.  Mr. Bellido was actually face-to-face with this person for about two (2) or three (3) seconds, long enough for the person to ask, "Can you help me?" and for Mr. Bellido to respond, "I'll be right with you."  Before Mr. Bellido was face-to-face with this person, he saw the person out of the corner of his eye.  Mr. Bellido testified that once the person actually approached him, Mr. Bellido got a good look at the person's face.

After the two (2)- to three (3)-second encounter with the person, Mr. Bellido went into the office/computer room with the grocery manager and the assistant customer service manager and called 911.  He may have put one of his assistants on the phone with the operator at some point, but he does not recall.  While he was on the phone, Mr. Bellido was looking out a window and observed the person, who was still in the store.  Initially, the person was about twenty-five (25) feet away, but then the person moved to the customer

---

[5]     The person Mr. Bellido identified as the person in the BOLO is referred to interchangeably as "the person" or "the suspect."

service desk just outside the office, which was about ten (10) feet away.  Mr. Bellido does not recall how long he was looking at the suspect through the window.  Mr. Bellido also does not recall exactly what he reported to the 911 operator.  He was "pretty panicked at the time."

While Mr. Bellido was still in the office, the person walked away from the customer service desk.  Through the window, Mr. Bellido watched the person walk out the front door of the store.  A few seconds later, Mr. Bellido exited the office and followed the person outside.  He lost sight of the person briefly, but then saw the person get into a green SUV.  According to Mr. Bellido, the SUV matched the description of the vehicle described in the BOLO.  Mr. Bellido got the license tag number of the vehicle, but he does not remember whether he wrote it down.  The person drove away quickly.

Eventually a deputy sheriff arrived at the store.  Mr. Bellido does not remember how long it took the deputy to arrive.  He believes the deputy then left the area to look for the vehicle but returned to the store approximately ten (10) minutes later.

Mr. Bellido told the deputy a person he recognized from a BOLO had been in the store, and the person was wearing a baseball cap and a hoodie.  He also told the deputy the person had a lot of hair and may have been wearing a wig.  Mr. Bellido does not remember whether he advised the deputy about the person's "dipping" shoulder.  Mr. Bellido does not remember the color of the hoodie, although he recalls the hoodie was "down."  He testified that it looked like the person was possibly attempting to disguise himself.  Mr. Bellido described the person to the deputy sheriff either upon the sheriff's arrival at the store or after the deputy returned to the store.

When the deputy returned to the store, Mr. Bellido gave him the license tag number for the person's green SUV.  Mr. Bellido was standing outside the opened driver's side door of the deputy's car when he told the deputy the tag number.  The deputy typed the tag number into his computer and a screen came up with a photograph on it.  It was a photograph of the suspect.  Mr. Bellido cannot remember what the deputy said when he pulled up the photograph.  According to Mr. Bellido, the photograph did not show the suspect wearing the same clothes and having the same hair as he had on November 8, 2012, but the facial features matched.  Mr. Bellido does not recall whether the individual in the photograph was wearing glasses.

On cross examination,  Mr. Bellido acknowledged that when the deputy pulled up the photograph on the computer, he knew that the photograph was related to the license tag number he had given to the deputy.  When pressed about how certain he was that night that the person depicted on the deputy's computer screen was the person in the store, he stated he was "very, very . . . pretty sure."

At some point during the evening of November 8, 2012, Mr. Bellido watched Publix's surveillance video from that evening.  He recalls that he watched the video after the deputy arrived, but he does not recall whether the deputy was present when he watched the video.  Mr. Bellido did not testify about what he saw on the video.

On direct examination (prior to being shown any exhibits containing photographs), Mr. Bellido was asked whether he saw in the courtroom the person who approached him and asked for the manager.  Mr. Bellido identified Defendant without hesitation, pointing at him

and describing his shirt as white.[6]  He also confirmed that the person depicted in the photograph on the deputy's screen was the same person (Defendant) that he identified in the courtroom.  Mr. Bellido testified that "seeing him now is much clearer than the picture."

## B. Deputy Flinn

Deputy Flinn is employed by the Orange County, Florida Sheriff's Office, and he has been a patrol deputy for almost four (4) years.  He was on duty on November 8, 2012 and responded to a 911 call regarding an incident at a Publix supermarket.

A Publix employee called 911 and reported a suspicious incident:  a person matching the description of an attempted armed robber was in the store.  At some point, Deputy Flinn received an update that a green SUV had left the scene at a high rate of speed, so he patrolled the Sand Lake Road, Dr. Phillips, and International Drive area prior to going to the Publix on Sand Lake Road.  Deputy Flinn did not find the green SUV.  He then proceeded to Publix.  Deputy Flinn does not recall having contact with Mr. Bellido, the assistant manager at Publix, until after he looked for the vehicle.[7]

Deputy Flinn's first contact with Mr. Bellido was inside Publix near the customer service desk.  Mr. Bellido gave Deputy Flinn a fairly detailed description of the suspect: white male; shoes; blue jeans; hoodie; baseball cap; fifty (50) to sixty (60) years old; no facial hair; long, dark hair, possibly a wig.  Deputy Flinn characterized the description as detailed, more detailed than most, and as accurate.  On cross examination, Deputy Flinn testified Mr.

---

[6]      At the February 10, 2014 hearing, Defendant was dressed in a white shirt, tan or gray slacks, and loafers.  He was unshackled.

[7]      Deputy Flinn referred to the "manager" of Publix, but in context it is clear he was referring to Mr. Bellido, the assistant manager.

Bellido did not provide the suspect's height, weight, skin tone or describe any tattoos.[8]  Also, Mr. Bellido did not describe other physical features like the suspect's ears.

Mr. Bellido gave additional information to Deputy Flinn.  He said the suspect was walking around and had selected a few items like red meat and oranges before the suspect approached him.  Mr. Bellido said he called 911 because all Publix stores had received a BOLO bulletin regarding attempted armed robberies at Publix stores.  Deputy Flinn testified that he was not familiar with the BOLO.

According to Deputy Flinn, Mr. Bellido told Deputy Flinn that he wrote down the tag number for the suspect's green Ford SUV, and he gave Deputy Flinn the tag number.  Deputy Flinn escorted Mr. Bellido outside to Deputy Flinn's vehicle to run the license tag number in DAVID.  Deputy Flinn wanted to see if the description of the vehicle matched with the tag number.

Deputy Flinn sat in the driver's seat of his vehicle.  His computer, a standard Dell laptop with a fifteen (15) to seventeen (17) inch screen, was to his right in a computer stand that is attached to the vehicle.  Mr. Bellido was standing outside the vehicle, on the driver's side.  Deputy Flinn did not necessarily know whether Mr. Bellido could see the computer screen from where he was standing or whether Mr. Bellido was looking at the computer screen when Deputy Flinn was running the tag number in DAVID.

When Deputy entered the tag number in DAVID, several items came up on the computer screen, including a driver's license photograph in the top left-hand corner.  According to Deputy Flinn, the photograph was two (2) to three (3) inches in size.  He

---

[8]    Defendant does not have any tattoos that were visible during the February 10, 2014 hearing.

testified that the layout on his computer screen was not the same as the DAVID printout submitted into evidence by the Government. <u>See</u> Gov. Ex. 2. On his screen, the photograph was in the upper left-hand corner; the photograph on his screen was larger; and the photograph was in color and more clean and crisp.

As soon as the photograph appeared on the computer screen, Mr. Bellido stated, "Yeah, that's him." When testifying at the hearing, Deputy Flinn was somewhat expressive in quoting Mr. Bellido, and he characterized Mr. Bellido as being pretty certain the person depicted was the suspect. Deputy Flinn testified that he did not intentionally show the photograph to Mr. Bellido, and he is not sure whether he and Mr. Bellido talked about how sure Mr. Bellido was that the photograph on the computer was that of the suspect.

Deputy Flinn did not show Mr. Bellido a photo spread or do a human show up. Also, he did not put out a BOLO. He explained that he did not take such actions because a crime had not been committed; it was just a suspicious incident.

**C. Government's Exhibits**

**1. Gov. Ex. 1** is a full-page enlarged photograph of Defendant's photograph on the DAVID printout (<u>see</u> Gov. Ex. 3). Mr. Bellido recognized this photograph as being the suspect, but he could not recall whether it was the photograph he saw on November 8, 2012 on Deputy Flinn's computer screen. Defendant is wearing glasses in the photograph.

**2. Gov. Ex. 2** is a black and white copy of the BOLO emailed by the Publix loss prevention department to Mr. Bellido sometime during the week or two before November 8, 2012. It is the same as Def. Ex. 3, except Def. Ex. 3 is in color.

**3.  Gov. Ex. 3** is a copy of the DAVID printout of Defendant.  As described above, the actual computer screen display on Deputy Flinn's computer was different than Gov. Ex. 3 in a number of respects: the photograph of Defendant was larger on Deputy Flinn's screen; it was in the upper left-hand portion of the screen; and it was in color, clear and crisp.

### D.  Defendant's Exhibits[9]

**1.   Def. Ex. 2** is the CAD report dated November 8, 2012.  Deputy Flinn testified in some detail about the CAD report and its content.  The report documents certain information contained in communications made to and provided by police dispatchers.  The CAD report is heavily coded.  Even Deputy Flinn was unable to interpret all of the codes.  Information received by dispatchers is usually inputted very close in time to when the dispatcher receives the information.  The time shown on the report for an event reported to or called in to the dispatcher may or may not accurately reflect when the event being recorded occurred, because the event may have occurred in advance of the report to the dispatcher.

In the CAD report, Deputy Flinn's code is "330A."  The report reflects that at 18:09:06 (6:09 p.m.), a 911 call was received by the 911 dispatcher concerning a robbery/firearm.  The caller's name is blacked out, but the parties have filed a Stipulation (Doc. No. 52) indicating they agree that the redacted name is "Danielle," whom Mr. Bellido testified is the assistant customer service manager at the Sand Lake Road Publix.  According to Deputy Flinn, if the 911 caller remained on the telephone with the 911 operator, the operator would

---

[9]     Def. Ex. 1 is the same DAVID printout as Gov. Ex. 3, and it was not offered into evidence.

have sent out updated information as it was reported by the caller.  At 18:10:27 (6:10 p.m.), Deputy Flinn was dispatched to the scene.  He received a description of the vehicle at 18:24:28 (6:24 p.m.), and he received additional information about the vehicle at 18:25:26 (6:25 p.m.).  The report shows Deputy Flinn arriving at the Sand Lake Road Publix at 18:30:12 (6:30 p.m.).  He could have arrived sooner, but that is the time he called dispatch.  At 18:44:35 (6:44 p.m.), the tag number is reflected on the CAD for the first time, and it was entered by dispatch.

The probative value of the CAD report is marginal.  It to some degree undercuts Mr. Bellido's recollection of who called 911 and the chronology of events in general, but it sheds little light on the identification issues.

**2. Def. Ex. 3** is a color printout of the Publix BOLO.  According to Mr. Bellido, it looks much more like the BOLO he saw on the Publix computer screen than does Gov. Ex. 2.

## E.  Credibility Findings

The undersigned generally credits the testimony of Mr. Bellido and Deputy Flinn.[10] Although both witnesses could not recall certain details regarding the evening of November 8, 2012, and their testimony slightly conflicted mainly regarding the information provided to

---

[10]     In making these credibility determinations, the undersigned has considered various factors including the witnesses' demeanor, the consistencies or inconsistencies within the witnesses' testimony, and any interest the witnesses may have in the outcome of the hearing; but, the undersigned did not consider the official rank or status of the witnesses.  United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

the 911 operator and Deputy Flinn's arrival at Publix, any conflict was relatively minor and immaterial to the identification issues.

## IV.  Applicable Law

There is a two-step procedure for determining whether a photographic identification is violative of a defendant's due process rights.  A court first has to determine whether the identification procedure was impermissibly suggestive.  If the court finds that the procedure was impermissibly suggestive, it must then decide whether the identification was reliable in light of the totality of the circumstances.  Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see Neil v. Biggers, 409 U.S. 188, 199-200 (1972).  Although this two-part test applies equally to out-of-court and in-court identification procedures, as to in-court identifications, a court must determine whether a suggestive identification procedure creates a substantial risk of misidentification at trial.  See Jones v. Kemp, 794 F.2d 1536 (11th Cir. 1986); Marsden v. Moore, 847 F.2d 1536, 1545 (11th Cir. 1988).  "Reliability is the linchpin in determining the admissibility of identification testimony." United States v. Cueto, 611 F.2d 1056, 1064 (5th Cir. 1980) (citations omitted).[11]

"[A] single photograph display is one of the most suggestive  methods of identification and is always to be viewed with suspicion." Hudson v. Blackburn, 601 F.2d 785, 788 (5th Cir. 1979).  Courts have been critical of single photographic displays and generally find them to be unduly or impermissibly suggestive. See, e.g., id.; United States v. Jean, 315 F. App'x

---

[11]     In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

907, 912 (11th Cir. 2009).   Such a finding triggers a review of the totality of the circumstances to determine reliability.

In viewing the totality of the circumstances to determine the reliability of an identification, courts consider a number of factors, including the following: the witness's opportunity to view the suspect at the time of the crime or event; the witness's degree of attention; the accuracy of any prior description of the suspect by the witness; the witness's level of certainty of the identification; and the time between the crime or event and the identification. United States v. Beale, 921 F.2d 1412, 1433 (11th Cir. 1991) (citing Biggers, 409 U.S. at 199).

## V.  Discussion

### A.  Identification Procedure

Defendant argues that the display of a single photograph of Defendant to Mr. Bellido on November 8, 2012 was per se unduly suggestive.  The Government counters that for an identification procedure to be deemed unduly suggestive, there should be some type of affirmative action taken by law enforcement to encourage the identification, and that did not occur here.   The Government characterizes the situation as an "incidental viewing" of Defendant's photograph by  Mr. Bellido.  According to the Government, Deputy Flinn was just doing his job completing a report, so suppression of the identification will not deter police misconduct.

Although deterrence of impermissible police conduct has been taken into account to some degree when courts address the constitutionality of out-of-court identifications later sought to be introduced at trial, the United States Supreme Court has declined the invitation

to apply a per se rule of exclusion when an impermissibly suggestive identification procedure is employed.  See Manson, 432 U.S. at 110-13.  The focus of the inquiry here, as the undersigned sees it, is not necessarily whether the law enforcement officer encouraged the identification, but whether the procedure itself leading to the identification was unduly suggestive.  Deputy Flinn, using the tag number Mr. Bellido had just provided to him for the suspect's vehicle, pulled up a single photograph of Defendant on his computer in Mr. Bellido's presence.  Mr. Bellido then identified the person depicted as being the suspect. Although Deputy Flinn did not verbally encourage Mr. Bellido's identification of Defendant, he took the affirmative action of inputting the tag number given to him by Mr. Bellido into his computer.  This was done in Mr. Bellido's presence and resulted in a single photograph of Defendant being displayed to Mr. Bellido.  This identification procedure, albeit not designed by or necessarily purposeful on Deputy Flinn's part, was unduly and impermissibly suggestive.

## B. Reliability of Identifications

The inquiry now moves to the second step of determining whether, under the totality of the circumstances, the out-of-court identification and in-court identification of Defendant by Mr. Bellido are reliable.  It goes without saying that a number of  factors to be considered as to the out-of-court and in-court identifications overlap, yet there are some factors that may be more critical to one of the identifications than the other.  Of course, the undersigned is guided by the list of factors set out in Beale, 921 F.2d at 1412, that is summarized above, but recognizes that the list is not exhaustive.  Overlapping factors are discussed first, followed by a discussion of each identification separately.

As to Mr. Bellido's opportunity to view Defendant on November 8, 2012, Mr. Bellido initially saw Defendant out of the corner of his eye as Mr. Bellido walked away from the deli. Mr. Bellido was then face-to-face with Defendant for about two (2) to three (3) seconds when Defendant asked to see the manager.  Mr. Bellido continued to view Defendant through an office window while he was talking to the 911 operator.   As Mr. Bellido looked out the window, Defendant was initially about twenty-five (25) feet away and then Defendant moved to the customer service counter about ten (10) feet away.  Compare United States v. Rodger, 521 F. App'x 824, 830 (11th Cir. 2013) (approving the admission at trial of out-of-court show-up identifications of a robber and noting that the eyewitnesses to the robbery "had ample opportunity to view [the suspect] during the crime"), with Marsden, 847 F.2d at 1546 (disapproving the admission of an in-court identification after an unduly suggestive out-of-court identification, stating the observant's two "glimpses [of the suspect] were brief, and the observant "never got a full frontal view of the man . . .").

Mr. Bellido's opportunity to view Defendant must be examined in the context of the heightened attention Mr. Bellido paid to Defendant.  During the week or two prior to November 8, 2012, Mr. Bellido received via email and reviewed a BOLO that had been sent to him by the loss prevention department regarding a suspect believed to be involved in attempting to rob Publix stores.  The moment Mr. Bellido saw Defendant on November 8, 2012, he believed Defendant was the suspect from the BOLO.  This belief was based upon certain similarities between the person depicted in the BOLO and Defendant, including the clothing worn and the "dipping" shoulder posture.  Although Mr. Bellido described himself as being "pretty panicked" that evening, his attention was focused sharply on Defendant

because he believed Defendant was the attempted robber shown in the BOLO.  Compare Rodger, 521 F. App'x at 830 (observing that the attention of a robbery victim/eyewitness "could not have been any stronger") (quotations and internal alterations omitted), with Marsden, 847 F.2d at 1546 (noting there was "nothing in [the observant's] testimony to indicate that her degree of attention was acute at the time" and "nothing unusual . . . made her pay special attention . . .").[12]  Mr. Bellido's opportunity to view Defendant and the circumstances in which he viewed Defendant weigh in favor of finding the identifications reliable.

Turning to the accuracy of any prior description, Mr. Bellido's description of the suspect to Deputy Flinn on November 8, 2012  focused for the most part on the suspect's clothing and hair (or wig), not on physical attributes or traits.  He did tell Deputy Flinn that the suspect was a white male, fifty (50)- to sixty (60)-years old.  Nevertheless,  Mr. Bellido gave a fairly detailed description of what the suspect was wearing, evidencing Mr. Bellido's attention to detail.  Compare Rodger, 521 F. App'x at 831 (noting that "eyewitnesses accurately described the robber" by describing his race and clothing and stating that he was armed with a handgun), with Marsden, 847 F.2d at 1546 (noting the observant's description "was very general").  This, too, weighs in favor of finding the identifications reliable.

---

[12]      Defendant correctly points out that the Court in Manson, 432 U.S. at 115, partially relied on the fact that the eyewitness was a trained police officer in finding an out-of-court identification based upon a single photograph to be reliable.  Indeed, the Court in Manson found that the eyewitness was a "specially trained, assigned, and experienced" police officer and "could be expected to pay scrupulous attention to detail" in observing the person.  Id.; compare Marsden, 847 F.2d at 1546 (stating the eyewitness was not a police officer and "not trained to pay scrupulous attention to detail" in finding the in-court identification unreliable).  Mr. Bellido obviously is not a trained police officer, and he has not received any special training when it comes to potential robbery situations.  Mr. Bellido's attention that evening was heightened, though, given that he believed the person in the store was the person he had seen in the BOLO.  Overall, this is a positive factor in the reliability analysis.

### 1. Out-of-Court Identification

The circumstances discussed above, in and of themselves, tend to suggest that the out-of-court identification was reliable, notwithstanding the unduly suggestive identification procedure.  But, there are three additional factors that must be considered and ultimately tip the scale to support a finding that the out-of-court identification was not sufficiently reliable to be introduced at trial: the actual viewing of the photograph by Mr. Bellido; the sequence of events immediately preceding the identification; and Mr. Bellido's level of certainty in making the identification.

The out-of-court identification of Defendant was made by Mr. Bellido from a single photograph about two (2) to three (3) inches in size displayed on a laptop computer screen while Mr. Bellido stood outside Deputy Flinn's vehicle and looked over Deputy Flinn's shoulder.  The laptop computer was to Deputy Flinn's right as he sat in the vehicle, meaning the computer was somewhere toward the center of the dash board.  The photograph was pulled up on the computer just after Mr. Bellido had provided the suspect's tag number to Deputy Flinn.  In fact, according to Deputy Flinn, he and Mr. Bellido were inside the Publix store initially and then exited the store so that he could run the tag number on his computer.  Also, Mr. Bellido testified that he knew the photograph Deputy Flinn pulled up on his computer was related to the tag information Mr. Bellido had just given to Deputy Flinn.  This sequence of events occurring so close in time – Mr. Bellido following the suspect to the vehicle and getting the tag number; the tag number of the suspect being provided to Deputy Flinn by Mr. Bellido; Deputy Flinn inputting the tag number in his computer in Mr. Bellido's presence; and a single photograph related to the tag number popping up on the screen –

created circumstances that undermine the reliability of the identification.  The reliability of the identification is further suspect because of Mr. Bellido's line of sight to the computer and the small size of the photograph.

Mr. Bellido's level of certainty also calls into question the reliability of the out-of-court identification.  Although Deputy Flinn testified that Mr. Bellido appeared confident in his identification of the suspect,  Mr. Bellido's testimony at the hearing to some degree belies that perceived confidence.  On direct examination, Mr. Bellido testified that the person depicted on the computer screen was not wearing the same clothes and did not have the same hair as the suspect, but the facial features were the same.  When pressed on cross examination about how certain he was of the identification, however, he first said the words "very, very . . . ," then he hesitated slightly and said, "pretty sure."  At another point during his testimony, on direct examination, Mr. Bellido was asked in substance if the person depicted on the deputy's computer screen was the same person he identified in the courtroom as the suspect.  He stated something to the effect that "seeing him now is much clearer than the picture."

Based on a review of the totality of the circumstances, the undersigned finds that the out-of-court identification of Defendant by Mr. Bellido on November 8, 2012 was not reliable and it should be excluded.

### 2.  In-Court Identification

When determining whether the in-court identification "ha[s] a reliable and sufficient basis independent of the suggestive photographic display," Marsden, 847 F.2d at 1546, the court must take into account "all the circumstances," Jean, 315 F. App'x at 912.  The

overlapping factors discussed above appear to weigh in favor of allowing Mr. Bellido's in-court identification of Defendant.  In addition to the factors already discussed, there are a number of additional factors to consider that can be divided into two main areas: the level of certainty of Mr. Bellido's in-court identification; and whether the unduly suggestive procedure so "seared" into Mr. Bellido's mind the image of Defendant that the in-court identification is unreliable.

At the hearing, Mr. Bellido was asked if he saw in the courtroom the person who approached him and asked for the manager.  Mr. Bellido, without hesitation, pointed to Defendant and said in substance, "the person wearing the white shirt."  As noted above, he stated something to the effect of, "seeing him now is much clearer than the picture."  There is no question that Mr. Bellido was sure that the person who approached him on November 8, 2012 was Defendant, and (as previously stated), the undersigned credits his testimony.

Regarding the impermissibly suggestive identification procedure on November 8, 2012 and its impact on the reliability of the in-court identification, the procedure that night could have had little or no impact on Mr. Bellido's ability to identify Defendant in court on February 10, 2014 for a number of reasons.  First, Mr. Bellido's line of sight to the computer screen that night and the small size of the photograph undercut the notion that viewing the photograph "seared" Defendant's image into Mr. Bellido's mind.  Second, it was obvious from Mr. Bellido's testimony that the suspect's posture ("dipping shoulder") in the BOLO and observed by Mr. Bellido on November 8, 2012 made an impression on him, a trait or characteristic he was able to view at the hearing in determining whether he saw the person in the courtroom who approached him in the store.  Third, Mr. Bellido could not confirm when

shown Gov. Ex. 1 (full-page DAVID photograph) whether that was the same photograph he saw the evening of November 8, 2012.  Further, he could not recall whether the individual in the photograph he saw that evening was wearing glasses, and it is clear from the evidence that the individual in the November 8, 2012 photograph was wearing glasses.[13] Mr. Bellido's inability to confirm these matters when presented with a large, full-page photograph of Defendant lends further support for the conclusion that the photograph from November 8, 2012 was not "seared" into Mr. Bellido's mind as the individual he saw in the store.  See Jean, 315 F. App'x at 912-13 (finding an in-court identification sufficiently reliable notwithstanding an unduly suggestive out-of-court identification and stating the witness "did not remember seeing [the] booking photograph or identifying [the defendant] from the photograph . . . [so] the booking photograph had minimal, if any, effect on [the witness's] trial identification").

These factors, when considered together with the overlapping factors, support a finding that the unduly suggestive identification procedure does not create a substantial risk of misidentification at trial.  The undersigned has also taken into account that the length of time between November 8, 2012 and the February 10, 2014 hearing (about fifteen (15) months) tends to be a negative factor in the totality of the circumstances, but this factor does not render the in-court identification unreliable.  Accordingly, the in-court identification of Defendant by Mr. Bellido should be allowed.

---

[13]    Mr. Bellido did, however, confirm that the person in Gov. Ex. 1 is the person he saw on November 8, 2012.  As stated previously, the in-court identification of Defendant occurred prior to Mr. Bellido being shown any exhibits.

## VI. Conclusion

Based on the foregoing, it is **RECOMMENDED**:

1.      That Defendant's Motion <u>In Limine</u> to Exclude the In-Court and Out-of-Court Identification of John Edwin Corn by Kenneth Bellido (Doc. No. 40) be **GRANTED in part and DENIED in part**.

2.      That the Motion be **GRANTED** to the extent that the out-of-court identification of Defendant made on November 8, 2012 by Kenneth Bellido be **EXCLUDED**.

3.      That the Motion be **DENIED** to the extent it seeks to exclude the in-court identification of Defendant by Kenneth Bellido.

**RESPECTFULLY RECOMMENDED** at Jacksonville, Florida on February 14, 2014.

James R. Klindt
**JAMES R. KLINDT**
United States Magistrate Judge

Copies:

Hon. Timothy J. Corrigan, U.S. District Judge
Assistant U.S. Attorneys (Taylor/Chokshi)
Susan Good Yazgi, Esquire